## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **LARRY D. PURVIANCE &** | ) | **Case No.  04-20665-TLM** |
| **VICTORIA A. PURVIANCE,** | ) | |
| | ) | |
| Debtors. | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| **VICTORIA A. PURVIANCE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adversary No. 04-6153-TLM** |
| | ) | |
| **REGION 1 SELF RELIANCE** | ) | |
| **PROGRAM,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ——————————————— | ) | |

## I.      INTRODUCTION

Larry and Victoria Purviance ("Debtors")[1] are joint chapter 7 debtors in

Case No. 04-20665-TLM.  On July 12, 2004, Victoria ("Plaintiff") filed a

_____

[1] On occasion and for clarity, the Court will also use the Debtors' first names.

MEMORANDUM OF DECISION - 1

complaint, Doc. No. 1, commencing the present adversary proceeding.[2]

She seeks an order declaring discharged her obligations under a certain Canadian child support order in favor of her ex-husband, Dr. Garnet Falck, (hereinafter the "Support Order"[3]).  Her complaint named as the only defendant "Region 1 Self Reliance Program," which is a division of the Department of Health and Welfare for the State of Idaho that is charged with collecting unpaid child support in Kootenai County, Idaho ("State").

The State answered the complaint and thereafter moved for summary judgment.  *See* Doc. Nos. 5, 13 and 17.  Victoria also moved for summary judgment.  *See* Doc. No. 12.  The Court issued a Memorandum of Decision (the "SJ Decision") and an Order granting partial summary judgment in favor of the State declaring that a prima facie enforceable debt existed, and denying the rest of the State's motion and denying Plaintiff's motion.  *See* Doc. Nos. 28, 29.

The Court was unwilling to conclude on summary judgment whether or to what extent the debt was "actually in the nature of . . . support" and thus nondischargeable under the provisions of § 523(a)(5)(B).  *See* Doc. No. 28 at 22-

---

[2]    The complaint, Doc. No. 1, was filed only by Victoria and did not include her husband and joint debtor (and licensed lawyer), Larry, as a named plaintiff.  Even though the "adversary proceeding cover sheet" which was attached to the complaint listed both Debtors as plaintiffs, the Court in a prior Decision followed the form of the complaint and of the other pleadings filed throughout this matter by both parties.  *See* Doc. No. 28.  Thus, it treats Victoria as the sole Plaintiff.  Larry is, in essence, her attorney, as well as interested in the outcome by virtue of being Victoria's spouse.

[3]    *See* Doc. No. 16 (Schwab Affidavit), at attached Ex. A (certified court file) at 2.

MEMORANDUM OF DECISION - 2

26.  Therefore the matter was set for trial so that the parties could present such

evidence on the issue as they deemed appropriate.

Trial occurred on October 26, 2005.  The matter was taken under

advisement upon the submission of post-trial briefing.

After consideration of the evidence, legal arguments, and applicable

authorities, the Court determines that the subject debt under the Support Order is

not dischargeable.  Judgment will be entered for the State.  The following

constitute the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P.

7052.[4]

## II.    SUMMARY OF APPLICABLE LAW AND THE SJ DECISION

The SJ Decision addressed the applicable law under § 523(a)(5),

particularly in light of the undisputed facts established in the summary judgment

process and set out by the Court in that Decision.  For ease of reference, that law

will here be summarized, though it is also addressed in Part IV *infra*.

### A.    Law on § 523(a)(5)(B)

#### 1.    A valid, enforceable debt

In general, before the Court can consider whether a debt should be excepted

from discharge under one of the subsections of § 523(a), the creditor must prove

_____

[4] Jurisdiction exists under 28 U.S.C. § 1334(b).  The matter is a core proceeding, *see* 28
U.S.C. § 157(b)(2)(I), upon which the Court may enter final judgment, 28 U.S.C. § 157(a), (b)(1).
Venue is proper.  28 U.S.C. § 1409(a).

MEMORANDUM OF DECISION - 3

that the debtor is indebted to it.  *See Banks v. Gill Distribution Ctrs., Inc. (In re Banks)*, 263 F.3d 862, 868 (9th Cir. 2001) (holding that "there are two distinct issues to consider in the dischargeability analysis: first, the establishment of the debt itself" and, second, the nature of the debt).  In granting partial summary judgment to the State, the Court concluded a valid, enforceable debt existed, evidenced by the Support Order issued by the Canadian court.  Plaintiff's various arguments why this Court should refuse to recognize the foreign Support Order were rejected.  Thus, the State established a debt existed.

### 2.    The nature of the debt

Section 523(a)(5) makes debts for child support and spousal support nondischargeable in bankruptcy.  It provides:

> (a)  A discharge under section 727 . . . does not discharge an individual debtor from any debt —
> . . .
>> (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that–
>> . . .
>>> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

MEMORANDUM OF DECISION - 4

Section 523(a)(5) (2004).[5]

This Court discussed in the SJ Decision several authorities on the question of dischargeability under § 523(a)(5)(B). It need not repeat them verbatim here. But some discussion and citation is warranted.

In *Beaupied v. Chang (In re Chang)*, 163 F.3d 1138 (9th Cir. 1998), the court held:

> The § 523(a)(5) exception to discharge strikes a balance between competing policies. On the one hand, the goal of providing a "fresh start" to the bankruptcy debtor requires that exceptions to discharge be confined to those plainly expressed. *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983). On the other hand, this court has recognized "an overriding public policy favoring the enforcement of familial obligations." *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir. 1984).

> When determining whether a particular debt is within the § 523(a)(5) exception to discharge, a court considers whether the debt is "actually in the nature of . . . support." *Id.* at 1316. This question is a factual determination made by the bankruptcy court as a matter of federal bankruptcy law. *In re Sternberg*, 85 F.3d 1400, 1405 (9th Cir. 1996), *rev'd on other grounds*, *In re Bammer*, 131 F.3d 788 (9th Cir. 1997) (en banc). A relevant factor for the bankruptcy court to consider when making this determination is how the particular state law characterizes the debt. *In re Catlow*, 663 F.2d 960, 962-63 (9th Cir. 1981).

---

[5] Two points are worth noting. First, the provisions of § 523(a)(5) have been substantially modified by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005). The instant litigation is controlled by the Code provisions existing immediately prior to BAPCPA. Second, § 523(a)(5)(A) addresses another basis for determining a support debt to be dischargeable, to wit, its "assignment" to the federal government, a state, or a political subdivision of a state. This provision is not urged by Plaintiff here; she evidently agrees that the State acts only as an enforcement agency for the beneficiaries of the Support Order, and was not assigned the rights under that Order within the sense of this Code provision.

MEMORANDUM OF DECISION - 5

163 F.3d at 1140.

Because of the policy favoring discharge, as noted in *Chang*, the party

asserting nondischargeability has the burden of demonstrating that the debt is truly

in the nature of support.  *See Kimball v. Kimball (In re Kimball)*, 253 B.R. 920,

925, 00.2 I.B.C.R. 106, 108 (Bankr. D. Idaho 2000) (noting that because the state

court's decision was equivocal, the plaintiff creditor could not meet her burden of

showing the allocation of debts was actually in nature of support) (citing *Gard v.*

*Gibson (In re Gibson)*, 103 B.R. 218, 220 (9th Cir. BAP 1989)).

A leading treatise on bankruptcy law explains the policy, and presumptions,

in the following fashion:

> In determining whether a particular debt falls within one of the
> exceptions of section 523, the statute should be strictly construed
> against the objecting creditor and liberally in favor of the debtor.  Any
> other construction would be inconsistent with the liberal spirit that has
> always pervaded the entire bankruptcy system.  One exception to this
> principle of statutory construction is found in section 523(a)(5), in
> which the term "support" has been given a broad construction by most
> courts to promote the congressional policy that favors enforcement of
> obligations for spousal and child support.  In this respect, Congress has
> overridden the general bankruptcy policy in which exceptions to
> discharge are construed narrowly.

4 Collier on Bankruptcy ¶ 523.05, 523-24 to 523-25 (Alan N. Resnick & Henry J.

Sommer eds., rev. 15th ed. 2005).

*Chang* acknowledges that the determination whether a debt is actually in

the nature of support for purposes of discharge is a question of federal bankruptcy

MEMORANDUM OF DECISION - 6

law.  *See also Kimball*, 253 B.R. at 923; *In re Martin*, 04.3 I.B.C.R. 131, 132

(Bankr. D. Idaho 2004); *Norris v. Norris (In re Norris)*, 94 I.B.C.R. 233, 234

(Bankr. D. Idaho 1994) (citing *Shaver v. Shaver*, 736 F.2d 1314, 1315-16 (9th Cir.

1984)); *see also Jodoin v. Samayoa (In re Jodoin)*, 209 B.R. 132, 137-38 (9th Cir.

BAP 1997).  In making this determination, the Court "is compelled to look beyond

the language of the [subject order or] divorce decree to the substance of the

obligation[.]" *Kimball*, 253 B.R. at 923 (citing *Shaver*, 736 F.2d at 1316); *see also*

Collier on Bankruptcy, § 523.11[6].

How does the Court go about this inquiry?  *Shaver* stated:

> In determining whether an obligation is intended for support of a former spouse, the court must look beyond the language of the decree to the intent of the parties and to the substance of the obligation.  The courts that have considered this issue have used several factors to aid in the characterization of the debt.  If an agreement fails to provide explicitly for spousal support, a court may presume that a so-called "property settlement" is intended for support when the circumstances of the case indicate that the recipient spouse needs support.  Factors indicating that support is necessary include the presence of minor children and an imbalance in the relative income of the parties.  Similarly, if an obligation terminates on the death or remarriage of the recipient spouse, a court may be inclined to classify the agreement as one for support.  . . .  The court will also look to nature [sic] and duration of the obligation to determine whether it is intended as support.  Support payments tend to mirror the recipient spouse's need for support.

*Shaver*, 736 F.2d at 1316-17 (internal citations omitted).[6]

---

[6]  A number of additional authorities were discussed in the SJ Decision, and are not here repeated.

MEMORANDUM OF DECISION - 7

The described standards require the Court to focus on the function served by the award or agreed obligation, *i.e.*, whether it was actually intended for the spouse's or child's "maintenance or support" at the time it was entered by the state court or otherwise established by the parties' agreement.

In the classic § 523(a)(5)(B) case, a debtor generally argues that what is seemingly cast as a support obligation is in fact a disguised property division or, conversely, a creditor argues that an award of fees or costs, or an obligation that appears to divide assets or allocate debts, truly served the purpose of providing support. This gives rise to the sorts of factors addressed in *Shaver*, those outlined in *Leppaluoto v. Combs (In re Combs)*, 101 B.R. 609, 616 (9th Cir. BAP 1989), and the numerous cases mentioned above and in the SJ Decision.[7]

Finally, the required focus is on the situation that existed at the time of the entry of the subject order or decree or agreement, and not the parties' prior situation or their current circumstances. Thus, in the present case, the critical inquiry is as of October 2000, the date of entry of the Support Order. However, facts either before or after that date, if proven to exist, may be relevant to that

---

[7] As discussed further below, the present case does not present such a "classic" situation where the debt is either property division or support, and the Court is asked to consider its "true" nature notwithstanding how the parties or the state court chose to characterize it. Here, Plaintiff does not contend that the Support Order is really a property division in disguise. What she really contends is that it could not truly be "support" because there was no economic need for her to pay support given Dr. Falck's resources. She does not clearly say what the obligation is, if not support, though the inference is that it was simply the result of Dr. Falck's desire to be punitive.

MEMORANDUM OF DECISION - 8

specific inquiry.[8]

## III.   FACTS

### A.   Undisputed facts as of summary judgment[9]

Victoria and her ex-husband, Dr. Falck, separated and, in January, 1997,

entered into a written agreement (the "Separation Agreement").  Under the

Separation Agreement, Victoria and Dr. Falck agreed that no *spousal* support or

alimony would be claimed by either party, but that Dr. Falck would pay Victoria

*child* support for their three children:

> [Dr. Falck] shall pay [Victoria] for the support and maintenance
> of the children of the marriage the sum of FIVE HUNDRED AND
> TWENTY ($520.00) DOLLARS per month for each of the children
> making together the sum of ONE THOUSAND FIVE HUNDRED
> AND SIXTY ($1,560.00) DOLLARS.  The payments shall begin on the
> 1st day of December, 1996, and continue on the first day of each and
> every month thereafter for so long as the children remain eligible. . . .
>
> [Dr. Falck] and [Victoria] confirm that [Victoria] is providing
> care and homemaking services for the children in [Dr. Falck's] home

---

[8]  A good deal of testimony related to matters preceding October, 2000, and still more related to events after the Support Order was entered.  Most of these were not relevant and are therefore not discussed in this Decision.

[9]  The relatively brief testimony and the one exhibit introduced at trial obviously did not tell the whole story.  Both parties rather evidently relied on their prior summary judgment submissions to establish much of the foundation for their respective cases.  The Court does not disagree with that approach *to the extent that* the summary judgment process established that certain facts were undisputed.  A different conclusion must be reached where the litigants appear to rely on affidavits they earlier submitted in relation to *disputed* facts.  Those attempts are improper and must be rejected, as allegations in earlier affidavits are not proper evidence for resolution of the issues which remained open at trial.  The Court has carefully reviewed the record and the contentions of the parties to ensure that facts as found in this Decision were (a) established by competent evidence introduced at trial or (b) were undisputed facts adequately established in the summary judgment process.  The latter facts are set forth in this Part III.A.

MEMORANDUM OF DECISION - 9

> to the extent of four hours per day.  In the event that those services are
> withdrawn or terminated, the maintenance as provided . . . shall be
> reduced by the sum of $200.00 per child per month.
>
> If the three children are residing with and receiving full care by
> [Victoria], the payments shall remain at $520.00 per month for each of
> the children of the marriage.

*See* Doc. No. 16, at attached Ex. A at 23-24.

The Separation Agreement acknowledged that the agreed division of

property and the child support arrangements did not comport with Canadian law,

but stated in several places that the terms of the Separation Agreement would

apply despite contrary provisions of Canada's Family Relations Act and Divorce

Act.  *See id.* at 22, 25.  The parties also agreed that the Separation Agreement

would survive the divorce of the parties.  *Id.* at 26.

In January, 1998, the Supreme Court of British Columbia entered an order

granting Victoria a divorce (the "Divorce Order").  *Id.* at 56.  The British

Columbia court granted joint custody to Victoria and Dr. Falck, determined the

parties' guideline incomes, and ordered child support in the following manner:

> [Dr. Falck] shall pay to [Victoria], for the maintenance and support of
> the children of the marriage, LISA ANN FALCK, [born] January 22,
> 1980, DANIEL STEWARD FALCK, born October 5, 1982, AND
> MATTHEW GRAEME FALCK, born May 5, 1986, the sum of
> $520.00 per month per child, for a total of $1,560.00 per month, for as
> long as the children are residing primarily with [Victoria] or, in the
> event that the children are not residing primarily with [Victoria], the
> sum of $320.00 per month per child, for a total of $960.00 per month
> . . . and shall continue . . . until the children are no longer children of
> the marriage as defined by the <u>Divorce Act, 1985</u>.

MEMORANDUM OF DECISION - 10

*Id.* at 57.

Upon the parties' divorce, Victoria moved to Idaho. The children stayed in Canada with their father.

Because Dr. Falck failed to make payments, Victoria registered the Divorce Order with the British Columbia Family Maintenance Enforcement Program ("FMEP") in December, 1999, so that the FMEP could enforce the agreement and collect past due support payments under the Separation Agreement and Divorce Order. When Dr. Falck was made aware of this attempt, he filed a motion with the British Columbia court to modify his child support obligations, set any past due amounts at zero, and obtain child support *from* Victoria. *See* Doc. No. 16, at attached Ex. A at 13.

While Victoria was personally served with Dr. Falck's motion, *see id.* at 10*,* she failed to appear for the hearing on the motion on July 4, 2000. At that hearing, the British Columbia court set the child support arrearage owed by Dr. Falck at zero, and varied the Divorce Order such that Dr. Falck was not liable for any child support payments in the future. *Id.* at 6-7. That court further ordered Victoria to provide Dr. Falck with income information to determine any possible child support obligations owed by her, and set a continued hearing on the matter. *Id.*

Victoria failed to appear at two further hearings or provide the income information required by the court's order. The British Columbia court ultimately

MEMORANDUM OF DECISION - 11

imputed an income to Victoria and ordered her to pay $300.00 per month for child

maintenance commencing October 1, 2000.  *See* Support Order at 2.  In addition,

the court awarded Dr. Falck $500.00 in costs.  *Id*.

Victoria did not appeal or otherwise challenge in the British Columbia

courts the Support Order entered against her.  The FMEP, responsible for the

collection and enforcement of the child support orders, now in favor of Dr. Falck,

issued a statement of arrears and sent the Support Order and statement to the State

for enforcement.

### B.    Additional facts established at trial

The foregoing summary of undisputed facts was not contradicted by any of

the evidence introduced at trial.  The evidence did, however, flesh out certain

details, and provided a few more facts relevant to the issue before the Court.[10]

Plaintiff and Dr. Falck were married for about 19 years according to

Victoria.[11]  This indicates the marriage occurred in 1979.  They had three children:

---

[10]  In certain instances in Part III.B, the Court combines trial testimony with undisputed portions of the prior record in order to set forth the facts in a slightly more cogent way than they were presented to the Court.

[11]  Victoria testified, as did her sister, Deborah Jane Arness.  Plaintiff called no other witnesses and introduced no exhibits.  The State called but one witness, who testified only in regard to the outstanding amount of the Support Order.  Thus, essentially all the evidence presented regarding the situation in October, 2000 (outside the undisputed facts gleaned from the summary judgment process), came from Victoria's perspective.  In some aspects, the trial testimony offered by Plaintiff was incomplete, unclear, glossed over detail, lacked evident foundation, or focused on irrelevant matters to the detriment of more important things.  In some (though relatively few) aspects, it was effectively challenged by the State's cross-examination.  Of course, in all regards, the Court has evaluated the credibility of the witnesses and determined

(continued...)

MEMORANDUM OF DECISION - 12

a daughter, Lisa, born January 22, 1980, and two sons, Dan, born October 5, 1982 and Matt, born May 5, 1986.

In 1981, Victoria and Dr. Falck purchased a house for $35,000.00 in Nelson, British Columbia.  They rented it out for two years, while they resided in New Guinea.  They moved to Nelson in 1983.

This house was sold in 1988 for $75,000.00, and the parties used the proceeds in acquiring another house located about 1/2 mile from Nelson for $175,000.00.  A mortgage on this house for the unpaid portion of the purchase price was retired in about 5 years.

Insofar as the testimony showed, Dr. Falck's medical practice provided the parties' sole income during the marriage.[12]  During some undefined portion of the marriage, Victoria worked as an office manager, secretary and bookkeeper in Dr. Falck's private practice.  She was paid about $35,000.00 per year, depositing the paychecks she received from the practice into the family's personal accounts. Victoria estimates Dr. Falck's gross yearly income at a relatively constant $140,000.00 though she indicated that it could vary by $10,000.00 or so, up or

---

[11](...continued)
the weight to be provided their testimony.

[12]  Victoria testified that the government of Canada provides a small monthly payment to women in the country with children, and that this amounted to $100.00 to $120.00 per month. Though this "income" was received by her and deposited to the family's accounts, its *de minimis* nature renders it unimportant in addressing the issues.

MEMORANDUM OF DECISION - 13

down, in any given year.[13]

In September 1997, Victoria started taking classes in Canada as a full-time college student.  Though she had no high school diploma, she was given "provisional" status to attend college-level classes.  As noted previously, it was in January, 1997, that the parties' Separation Agreement was reached.  It appears that her work at Dr. Falck's practice ceased at some point prior to this date.  Nothing indicates Victoria was otherwise employed during the marriage or at the time of separation and divorce.

In the divorce, Victoria received a lump sum payment of $40,000.00 from Dr. Falck.  She relinquished any interest in other marital assets, specifically including the Nelson house.  She testified that the home was, at that time, free and clear of debt, and that Dr. Falck placed a $40,000.00 mortgage against it to generate the funds paid to her.

Victoria also received in the divorce her interests in a retirement account. In cashing out this account starting in 1998, she lost about half its value to taxes and penalties for early withdrawal.  She ultimately received about $55,000.00 from this account.  She testified that Dr. Falck's retirement account at the time of the divorce, which he retained, was approximately as large as hers.

---

[13]  It did not appear to be Victoria's assertion that this average income was accurate for the entire 19 year duration of the marriage, but the number of years for which this average applied was not made clear.

MEMORANDUM OF DECISION - 14

Victoria used the $40,000.00 and the $55,000.00 over the next several years to provide for her support and her continuing education. She attended Boise State University in Boise, Idaho, starting in the spring of 1998. She eventually received a bachelors degree in psychology. It appears her bachelors degree was awarded in 2002.[14] She indicated that the funds she had from the retirement account and divorce settlement, plus some scholarship funds and about $2,800.00 of student loans, sustained her during the 1998-2002 period.

Victoria testified that she also used $7,000.00 of the funds from the divorce settlement and the retirement account in 1998, to hire an attorney to assist her in immigration matters so that she could be legally employed in the United States.[15]

Victoria indicated that after she came to Idaho, she regularly sent money to the children for school clothes, school supplies, and other reasons. Her testimony, and that of her sister, Deborah Jane Arness, indicated that Dr. Falck took regular vacations out of the country. At times, certain of the children would remain in

---

[14] From 2002 to May, 2004, Victoria was enrolled in a masters degree program at Idaho State University in Pocatello, Idaho. She commuted twice weekly to Pocatello from her home in western Idaho. She incurred $28,000.00 in student loans in the process of obtaining her masters degree in counseling in 2004.

[15] She did not testify in regard to any job(s) she held after successfully obtaining her "green card." Additionally, it appears she married Larry at some point prior to the entry of the Support Order in October, 2000 (*e.g.*, the Support Order refers to her as "Victoria Ann Falck, now known as Victoria Ann Purviance"). *See* Doc. No. 16, at attached Ex. A at 2. Nothing was said of employment she may have had while married to Larry, or of any financial support or assistance Larry provided her.

MEMORANDUM OF DECISION - 15

Nelson during such vacations.[16]  At other times, the Nelson house would be

"rented out" and the children would stay with Victoria or Ms. Arness.  On at least

two occasions, Victoria drove to Nelson to help care for the youngest child, Matt,

who had been left alone at the residence.[17]

Victoria testified to other expenditures she made for the children.  For

example, she advanced $7,000.00 to obtain a car for Lisa, and paid money in

regard to cars for Matt and Dan.  She also created a Canadian credit card account,

which she arranged for the children to access when they needed funds.  This was

an easier alternative, Victoria indicated, than sending cash or checks.  It was not

clear, however, just when these various events occurred.[18]

The evidence also established that Victoria and Dr. Falck had created a

---

[16]  There was some testimony, though in certain regards disjointed and sketchy, dealing
with the location of the children.  According to Victoria, Lisa left the Nelson home in 1998, the
same year Victoria moved to Idaho.  Lisa was in New Zealand most of that year.  She has since
returned periodically to Nelson but, for the most part, is self-supporting.  Dan moved with
Victoria to Idaho in January, 1998 but only stayed a month or so before wanting to return to
Canada.  He moved back and stayed with Ms. Arness for several months.  (Ms. Arness also
indicated that Lisa lived with her for about 6 months, post-divorce, while attending college.)  Dan
finally moved out of the Nelson home in September of 2000, shortly before the Support Order
was entered.  Matt was the only child left with Dr. Falck in Nelson after 2000.  Matt stayed for
"several months" (though in an unspecified year) with Ms. Arness.  Matt also stayed with
Victoria for a semester (and was home schooled during that time) while Dr. Falck was in Saipan.
This stay may have been in 2000, or later.

[17]  Matt was born in 1986 and was therefore 12 years old at the time of the divorce and 14
years old at the time of the Support Order.

[18]  Victoria was repeatedly asked to testify regarding the period "from 2000 to 2004."
The issue in the present case, as noted, focuses more on the financial status and related facts at or
about the time of the Support Order.

MEMORANDUM OF DECISION - 16

college fund[19] to assist each of the children with their first year of post-high school
education, and help with their education expenses in later years to the extent
possible.  The ability of the fund to do so was dependent on interest earned and
growth of the investments.  The amount of the fund was never established, though
there was testimony that several thousands of dollars were disbursed to the
children or on their behalf.

The testimony indicated that Dr. Falck has recently retired from private
practice, and he is presently 58 years old.  He would thus have been about 53 at the
time of the Support Order.  It appears he was employed in his practice at that time.

When Victoria commenced the enforcement process in 1999 against Dr.
Falck to recover unpaid support under the Divorce Order, she was contacted by Dr.
Falck.  She testified that he made a proposal to her to the effect that he would
agree to be solely responsible for the support of the children if she would abandon
the pursuit of the prior support claims and not seek to assert any support or
maintenance claims.  Victoria said she rejected this proposition, concerned over
whether the support to the children would actually be provided as promised.

Further, Victoria indicated that, when Dr. Falck's pleadings were served on
her, she failed to appear and defend because: she lacked the money to hire a

---

[19]  Though not very clear, the testimony left the Court with the impression that this was
something similar to what is known as a "529 plan" in the United States, *i.e.*, a savings or
investment vehicle with favorable tax treatment but also with certain restrictions on accumulation
and disposition of the fund.

MEMORANDUM OF DECISION - 17

lawyer; her schooling was hectic and stressful; she had no appreciation that the

issues involved included a change of which party was to pay child support; she had

just started a job that she would lose if she took time to go to court in British

Columbia; and she suffered feelings of persecution and was in therapy.[20]

The State established that the obligation under the Support Order as of the

date of trial was $11,743.03 USD ($13,958.20 CAD), and that no payments were

ever made on the obligation voluntarily by Victoria, though $600.00 USD was

garnished from her wages.  *See* Ex. A.  The State's witness[21] indicated that the

Support Order was "lump sum" in nature rather than in "descending order."  This

means that the obligation did not vary in amount depending on the number of

children and was not reduced as each child was emancipated.

## IV.    DISCUSSION AND DISPOSITION

### A.    The amounts under the Support Order labeled as support

The Support Order required that: "plaintiff Victoria Ann Falck, now known

as Victoria Ann Purviance, pay to the defendant Garner Ralph Falck $300 per

month for *child maintenance* commencing on the 1st day of October, 2000 and

---

[20]  Recall, Victoria had also previously indicated that she never received service of the support modification pleadings, a contention effectively abandoned by her during the course of proceedings herein, and rejected by the Court in the SJ Decision.

[21]  The State's one witness, Sharon Banducci, an employee of the Child Support Division at the Idaho Department of Health and Welfare, testified in connection with the transmittal of the Support Order to Idaho for collection, its supporting documentation and history of accrual and collection, and its present outstanding balance.

MEMORANDUM OF DECISION - 18

continuing on the first day of each and every month thereafter." Doc. No. 16, at

attached Ex. A at 2 (emphasis added). The Support Order was entered after

Victoria had started a process to collect prior child support, and Dr. Falck

responded with a request to modify the extant orders so as to eliminate his

obligation to pay support and impose that obligation on Victoria instead.

Facially, therefore, the subject debt certainly appears to be actually in the

nature of child support. It was so denominated. Nothing in the evidence indicates

that it was something else. This obviously is not the situation where parties

contend that an obligation denominated as support is actually a property division.

As noted, the authorities make it clear that labels do not control. The Court

is required to evaluate all relevant factors and facts in determining if the obligation

is actually in the nature of support. Those facts, primarily the records of the

British Columbia court that were established and undisputed in the summary

judgment process and not impeached or contradicted at trial, indicate that the debt

cannot be seen as anything other than support.

Recall, Dr. Falck's reply to Victoria's enforcement efforts was to ask the

Canadian court to cancel his outstanding obligation, eliminate any future child

support to be paid by him, and to impose an obligation on Victoria to pay child

support. That court thus had no issue before it other than child support on which a

monetary obligation against Victoria would be premised.

MEMORANDUM OF DECISION - 19

Recall further that, in entering the Support Order, the Canadian court imputed an income to Victoria, based on her failure to appear and provide evidence of income, and then reached a conclusion on the magnitude of the child support obligation that should be imposed. This further supports the "actual" nature of the debt as support.

Stripped of gloss, Victoria's arguments are not that this debt represents something other than child support. Instead, it is her contention that the Canadian court should not have awarded any support to Dr. Falck given the relative incomes, expenses and resources of the two parties. She argues the court made an error in its ruling on the subject of child support.

Victoria emphasizes that, under the evidence (*i.e.*, her testimony and that of her sister), several facts relate to the respective financial condition of the parties and the question of Dr. Falck's need for child support.[22]

1.      In 2000, Dr. Falck was employed in a private medical practice and had been for a significant period of time. The practice was successful, and had supported the family, including Victoria, prior to the divorce. Dr. Falck's gross income was estimated at $140,000.00.

2.      In 2000, Victoria was a student, and paying for her education and

---

[22] Though some of the testimony related, on the surface, to the question of financial need and the parties' circumstances and conditions at the time the Support Order was entered, as already noted, the testimony was in many ways unclear and incomplete, even though it may have been unrebutted.

MEMORANDUM OF DECISION - 20

supporting herself through the use of what remained of the liquid assets she obtained in the divorce.[23]

3.    In the 1998 divorce, Dr. Falck received the Nelson house worth at least $175,000.00 and at that time it was free and clear of debt except for the $40,000.00 mortgage incurred to generate the cash needed for the divorce settlement.[24]  Dr. Falck also had at the time of divorce a retirement account of perhaps $110,000.00 and, of course, his practice.[25]

4.    In the divorce, Victoria received $40,000.00 and her retirement account of roughly $110,000.00, which generated about $55,000.00 net of penalties and taxes once she cashed it out.

5.    In 2000, Lisa was 20 years old and out of the house, and Dan was 3 days shy of 18, and still living there.  Matt was 14 and living at the house.  Each of the children spent a significant amount of time with Victoria and/or her sister, Ms. Arness, away from the house in

---

[23]  On the other hand, she had the ability to be employed, having worked in Dr. Falck's practice as a secretary, office manager and bookkeeper.  In her testimony, Victoria did not disclose any employment income in the 2000 time frame, and she did not discuss any financial support she had by virtue of remarrying.

[24]  Victoria and her sister argued that market conditions have improved in Nelson such that the house's value may have doubled.  Of course, the asserted value in 2005, even if the testimony is to be given credence, does not establish its value in 2000.

[25]  Nor did either witness have knowledge of Dr. Falck's financial affairs after 1998 other than in the most general sense (he took vacations out of the country; he made investments; he provided some ongoing support to the children; etc.).

MEMORANDUM OF DECISION - 21

Nelson, following the divorce.

6.　　In 2000, college expenses had been incurred by Lisa and soon would be incurred by the other children.  To some degree, the expenses were covered by funds from the college "scholarship fund" and, to another indeterminate extent, by payments directly from either Victoria or Dr. Falck.

7.　　In 1999 or 2000, Dr. Falck offered to assume 100% of the support obligations for the children, if Victoria would waive collection of the prior outstanding support and not assert any rights to maintenance.

Even assuming that the overall weight of this evidence indicates that, in 2000, Dr. Falck was equally well or better positioned than Victoria to provide support for the children, Victoria's contentions under § 523(a)(5)(B) are unavailing.  Such an evidentiary showing would not mean that the Canadian order was not "actually in the nature of (child) support."  It might mean that the Canadian court "got it wrong" and should not have awarded any support to Dr. Falck.  But the § 523(a)(5)(B) inquiry does not invite the bankruptcy court to review the merits of the other court's ruling as to whether a party should have been awarded support, or whether the amount of the support award was justified.  *See Kimball*, 002.I.B.C.R. at 107 ("It is not the function of this Court to reconsider the evidence presented to the state court, or to ponder additional facts not presented, in

MEMORANDUM OF DECISION - 22

making a dischargeability determination under Section 523(a)(5).")  Instead, this

Court's charge is to ensure that support awards – if actually in the nature of

support (and not something else) – are upheld.  As *Chang* notes, the Code requires

that true support debts be declared nondischargeable, thus furthering "the

overriding public policy favoring the enforcement of familial obligations."  163

F.3d at 1140.

     Therefore, upon the entirety of the evidence and record, the Court

concludes that the obligations under the Support Order, designated as child

support, are not discharged.  *See* § 523(a)(5)(B).  This determination addresses the

bankruptcy issue – discharge – which is within the province of this federal court.

This Court expresses no opinion as to whether the Canadian court was correct or

incorrect in its application of its own law to the facts before it in 1999 and 2000.  It

further expresses no opinion on whether Victoria would or should be entitled to

now seek review of the merits of that decision, or to seek additional modification

regarding support, by or from the Canadian courts.

     **B.**     **The amount in the Support Order for costs**

     A portion of the Support Order obligation ($500.00) is attributable to

"costs" awarded to Dr. Falck.  *See* Doc. No. 16, at attached Ex. A at 2.  The

Support Order does not state the basis on which this cost award was made.  *Id.*

While a comment not attributable to the Canadian court, the FMEP refers to this

MEMORANDUM OF DECISION - 23

award as a "penalty" owed to Dr. Falck.  *See* Ex. A at 5.

This Court has previously noted that the primary consideration in determining if an award of fees or costs in connection with a divorce or related matter is nondischargeable is whether it was based on financial need of the recipient.  *See Martin*, 04.3 I.B.C.R. at 132 (citing *Norris*, 94 I.B.C.R. at 235); *Kimball*, 253 B.R. at 923-24.

Many of the "facts" Victoria relies upon can be viewed as relevant to the question of Dr. Falck's need, or lack thereof, for this award.  Based on the evidence before the Court, it is not at all clear that Dr. Falck needed this cost award for support or that the Canadian court intended the cost award as support. As the State carries the ultimate burden to prove the debt should be nondischargeable, the Court must conclude the State has failed to meet its burden and the portion of the debt attributable to the award of costs is discharged.

## VI.    CONCLUSION

For the reasons stated, this Court finds that the obligations owed by Plaintiff under the Support Order - - with the exception of the $500.00 in costs - - are "actually in the nature of . . .  support" under § 523(a)(5)(B).  Therefore, Victoria owes a $13,458.20 CAD nondischargeable child support debt.  *See* Ex. A at 5 (account summary separating out the amount owed as costs).  Counsel for the State may prepare a form of judgment consistent with this Decision.

MEMORANDUM OF DECISION - 24

DATED:  November 8, 2005



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 25

<u>CERTIFICATE RE: SERVICE</u>

A "notice of entry" of this Decision, Order and/or Judgment has been served on Registered Participants as reflected by the Notice of Electronic Filing. A copy of the Decision, Order and/or Judgment has also been provided to non-registered participants by first class mail addressed to:

Larry D. Purviance
Victoria A. Purviance
2021 W. Lundy
Post Falls, ID 83854

Case No.  04-6153 (Purviance v. Region 1 Self Reliance Program)

Dated:  November 8, 2005

 <u>/s/Jo Ann B. Canderan</u>
Judicial Assistant to Chief Judge Myers

MEMORANDUM OF DECISION - 26